UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRUCE SWEEPER,

                                        Plaintiff,

            vs.
                                                              9:06-CV-379
J. TAYLOR, Superintendent, Gouverneur                         (NAM/GJD)
Correctional Facility; OFFICER McCOY;
OFFICER McBRIDE,

                                        Defendants.
_____

APPEARANCES                             OF COUNSEL

Bruce Sweeper
08-A-3774
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021
Plaintiff *Pro Se*

ANDREW M. CUOMO                         Steven H. Schwartz
Attorney General of the                 Assistant Attorney General
State of New York for Defendants
The Capitol
Albany, New York 12224-0314

**NORMAN A. MORDUE. Chief United States District Judge**

**MEMORANDUM DECISION AND ORDER**

        In this amended civil rights complaint, plaintiff alleges that defendants violated plaintiff's

First Amendment right to practice his religion. (Dkt. No. 11).  Plaintiff seeks monetary as well as

injunctive relief.  Presently before the court[1] is defendants' motion for summary judgment

pursuant to FED. R. CIV. P. 56. (Dkt. No. 37).  Plaintiff has responded in opposition to the motion.

(Dkt. No. 42).  For the following reasons, this court agrees with defendants and will order

dismissal of the amended complaint in its entirety.

_____

        [1] The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has
been rescinded for purposes of this motion, and as such, any appeal taken from this order, if appropriate, will be to
the Court of Appeals for the Second Circuit.

**DISCUSSION**

1.     **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

2.     **Facts**

     **A. Amended Complaint**

Plaintiff alleges that on October 17, 2005, he was an inmate of the Department of Correctional Services (DOCS), incarcerated at the Gouverneur Correctional Facility (Gouverneur). (Dkt. No. 11).  Plaintiff states that at approximately 2:00 p.m., he was working in the mess hall when defendant Corrections Officer (CO) McCoy walked by plaintiff as he was praying.  Plaintiff is a Muslim, and October 17, 2005 was during Ramadan, a Muslim holiday.

Defendant McCoy told plaintiff to stop praying and gave plaintiff a misbehavior report when plaintiff did not comply with defendant McCoy's order.  In the amended complaint, plaintiff claims that defendant McCoy put plaintiff in the Special Housing Unit (SHU) for praying, and that plaintiff spent thirty days in SHU as a result. Amended Complaint (AC) at 2(a).[2]

Plaintiff alleges that defendant CO McBride's name appears on the "statement of the evidence" from plaintiff's disciplinary hearing, however, plaintiff claims that defendant McBride was not working on October 17, 2005, making the disciplinary determination invalid. *Id.*  Plaintiff has also named Superintendent J. Taylor as a defendant.  Plaintiff claims that defendant Taylor failed to implement a proper policy that would allow inmates to pray at work.  Defendant Taylor's failure to do so allowed plaintiff to be improperly placed in SHU for praying in the mess hall.

### B. Additional Facts

In support of their summary judgment motion, defendants have submitted the plaintiff's disciplinary records regarding this incident, together with the declaration of Captain Clement Croyer, the hearing officer for plaintiff's disciplinary hearing. Croyer Decl. & Exs. A, B (Dkt. No. 37(8)-37(10)).  Defendants have also submitted  the plaintiff's "grievance packet," including all the documents submitted in conjunction with the grievance filed by plaintiff subsequent to this incident. Statement of Material Facts & Ex. A-D (Dkt. No. 37(3)-37(7)).

The Croyer Declaration states that Captain Croyer conducted a Tier III disciplinary hearing against plaintiff on October 19, 2005. Croyer Decl. ¶ 2.  The hearing was based on a misbehavior report written by defendant McCoy. *Id.*  The misbehavior report shows that it was

---

[2] Plaintiff has inserted unnumbered pages in between the pages of the form complaint.  The court has simply numbered the pages following a form-page as the same form number plus a letter.  Thus, this page follows page 2, but is before page 3.

written by defendant McCoy, who stated that on October 17, 2005, he walked in the back of the mess hall and observed "inmates" praying in the hot box room where supplies for the mess hall were kept. Croyer Decl. Ex. A at p.3.  Defendant McCoy further stated that plaintiff was praying "with 6 other inmates." *Id.*  Defendant McCoy alerted Sergeant King and gave the inmates a direct order to stop praying. *Id.*  The inmates ignored defendant McCoy's order and continued to pray for approximately ten minutes until Sergeant King arrived. *Id.*  Plaintiff was escorted to SHU as a result, and defendant McCoy wrote the misbehavior report, charging plaintiff with a violation of Rules 104.13 (creating a disturbance); 105.10 (unauthorized assembly); 105.11 (religious services); and 106.10(violating a direct order).  The misbehavior report also lists the other inmates who were involved. *Id.*

A transcript of the disciplinary hearing has been submitted in support of the summary judgment motion. Croyer Decl. Ex. B (Transcript)(T).  At the beginning of the disciplinary hearing, Captain Croyer read plaintiff the charges and asked how plaintiff pled to the individual rule violations. (T. at 2).  Captain Croyer also read the names of the other inmates involved, one of whom was an individual named "McBride." *Id.*  Plaintiff pled "not guilty" to all of the charges except "refusing a direct order." *Id.*  Although plaintiff did not make a specific statement, Captain Croyer asked plaintiff if he and the other inmates "were under the impression that it was ok for you to pray in your group back there. [sic]" *Id.*  Plaintiff told Captain Croyer that plaintiff believed that he was allowed to pray in that location, and that the inmates had been praying there "since beginning of (inaudible)." *Id.*  Captain Croyer repeated the question and plaintiff stated that the inmates "were in the kitchen at the time of our prayers." *Id.*

At that time, Captain Croyer adjourned the hearing to make his decision. (T. at 2-3). When Captain Croyer went back on the record, he began his oral disposition by stating that he

4

relied upon "the written report of Officer McBride, which indicates that you refused his orders . . .

." (T. at 3).  Captain Croyer then stated that

> [y]ou guys were praying in a group, but it appears to me that you
> were under the impression that is [sic] was ok to pray in a group
> down there in the mess hall.  However, by your own admission, you
> did disobey the officers [sic] orders to stop which is the reason I
> found you guilty of a direct order.

*Id.*  Captain Croyer states in his declaration that plaintiff pled guilty to refusing the order, and

Captain Croyer thus, found him guilty of the charge and sentenced plaintiff to forty five days in

SHU, together with a loss of privileges. Croyer Decl. ¶ 3.  Plaintiff was found "not guilty" of all

the other charges.

Captain Croyer also states that when he set forth his disposition on the record at the

hearing and when he wrote his "Superintendent Hearing Disposition Rendered"[3] form, he

"inadvertently and incorrectly, stated that the evidence [he] relied upon was 'the written report of

Officer McBride . . . ,' when [he] meant to say Officer McCoy." Croyer Decl. ¶ 5.  Captain

Croyer states that based on a review of all the records, it is clear that the misbehavior report was

written by, and the decision was based upon evidence provided by, Officer McCoy, not Officer

McBride. *Id.* ¶ 6.  The disposition was based solely upon the McCoy misbehavior report and

plaintiff's own guilty plea to that particular charge. *Id.*  By his own admission,[4] plaintiff served

only thirty of the forty five day penalty. AC at p.2(a); Def. Rule 7.1(a)(3) Statement ¶ 5 & Ex. C

at p.1.

On November 21, 2005, plaintiff filed Grievance No. GOV-11061/05 regarding this

---

[3] A copy of this report is attached to the Croyer Decl. Ex. A at p.2.

[4] The amended complaint is incorrect with respect to the penalty originally imposed.  In the amended complaint, plaintiff alleges that the penalty was originally "90 days," but he only served "30 days." AC at p.2(a).  It is clear, however, from all the evidence that Captain Croyer only imposed a forty five day penalty.  This discrepancy does not affect this court's decision.

incident. Def. Rule 7.1(a)(3) Statement Ex. A at p.3-4.  Plaintiff complained that he was not able to pray at the appropriate religiously mandated times.  He stated that he wanted "to be able to pray when my prayer comes at its set [] time, at work, or be able to go back to my cube to pray." *Id.*  Plaintiff also requested that the misbehavior report be expunged from his records because the name of the officer on the statement of evidence relied upon was not the officer who actually witnessed the misbehavior and who signed the misbehavior report. *Id.*

The Inmate Grievance Resolution Committee (IGRC) denied plaintiff's grievance.  First, the IGRC found that it could not expunge plaintiff's misbehavior report because misbehavior reports are not "grievable," and plaintiff would have to use his available disciplinary appeal remedy. *Id.* Ex. A at pp.7 (summary of case history of grievance), 11.  The IGRC also found that according to a previous decision of the Central Office Review Committee (CORC), praying must be done in an inmate's living quarters or in designated religious areas. *Id.*  The Superintendent affirmed the findings of the IGRC. *Id.* Ex. A at pp.2, 7.  The Superintendent also noted that the issue of praying at work or program was previously addressed by the CORC and "is clearly outlined in Directive # 4202.  There is no provision for an inmate to pray while at program, or in your case, in the Mess Hall." *Id.*

Plaintiff appealed the Superintendent's decision, and the CORC affirmed. *Id.* Ex. A at pp.1, 7.  Plaintiff argued that his religious practices could be accommodated without negative effect on prison security or rehabilitation. *Id.* at p.7.  Plaintiff also argued that he had a First Amendment right to engage in his prayer at work. *Id.*  The CORC affirmed the Superintendent and quoted the pertinent section of Directive # 4202, relating to "individual demonstrative prayer" and "congregate or group prayer." *Id.*  A copy of the relevant portion of Directive # 4202 has been attached to the grievance materials. *Id.* Ex. A at p.5 (DOCS Directive # 4202(K)(1) &

6

(2).

Defendants have also included as an exhibit, a memorandum from the Muslim Chaplain, Yahya Abdur Rahim. Def. Rule 7.1(a)(3) Statement Ex. D.  This memorandum is addressed to the Watch Commander, is dated August 31, 2005, and relates to the 2005 Ramadan holiday. The memorandum discusses fasting, meals, and prayers during the Ramadan holiday. *Id.*  There is no discussion about inmates being authorized to pray at their assigned program or work area.

**3.    Misbehavior Report**

Plaintiff does not appear to challenge the process that he received at his disciplinary hearing.  He does not name Captain Croyer as a defendant and does not complain about the disciplinary hearing itself.  Plaintiff argues that the misbehavior report should be expunged because defendant McBride "lied" about witnessing the incident, and was not even at work on October 17, 2005.  Plaintiff seems to think that the misbehavior report is "false" because Captain Croyer allegedly relied upon evidence submitted by defendant McBride.  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

First, the misbehavior report was not false.[5]  Plaintiff admits what he was doing and admitted at the disciplinary hearing that he refused to obey defendant McCoy's order to stop praying.  Plaintiff claims that he was justified in doing so because he was entitled to pray in the mess hall.  Second, it is clear that defendant McBride was not involved in any part of plaintiff's claim.  Plaintiff states that Officer McBride was ***not working*** on October 17, 2005.  Captain

---

[5] In any event, a "false" misbehavior report on its own does not rise to the level of a constitutional violation as long as the subsequent disciplinary hearing affords the inmate due process. *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986), cert. denied, 485 U.S. 982 (1988).

Croyer states in his declaration that he mis-spoke when he stated that he relied on the evidence provided by "Officer McBride." Croyer Decl. ¶ 5. All the evidence in the records supports this assertion by Captain Croyer. The court notes that one of the inmates involved in the prayer incident with plaintiff was named "McBride." *See* Croyer Decl. Ex. A at p.3. In any event, plaintiff pled guilty to the refusal to obey a direct order, thus, Captain Croyer relied, not only on the misbehavior report statement, but on plaintiff's guilty plea. Thus, defendant McBride was not personally involved with plaintiff at all, and the amended complaint may be dismissed as against defendant McBride.

Although plaintiff does not really challenge the disciplinary determination in itself, the court must point out that plaintiff has no due process right in connection with this disciplinary determination. In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). In *Sandin*, the court rejected a claim that ***thirty days*** in segregated confinement was "atypical and significant." Id. at 486.

The Second Circuit discussed the duration element of the *Sandin* analysis in *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000). The court in *Colon* noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90(2d Cir. 1999)). While often the issue is a question of fact in which the court must analyze the conditions of the confinement as well as the duration of the confinement, it is well-settled that a duration as short as the one involved in this case, the same time period

rejected by court in *Sandin*, without more, does not create a liberty interest that is protected by due process.

**4.    First Amendment**

Plaintiff argues that defendant McCoy violated plaintiff's First Amendment rights by giving him a misbehavior report for "praying."  Actually, defendant McCoy gave plaintiff a misbehavior report for a variety of rule violations, including failure to obey an order, creating a disturbance, unauthorized assembly, and unauthorized address.  Plaintiff, however, was not disciplined for "praying."  Plaintiff pled guilty to refusal to obey defendant McCoy's order to stop praying.  Thus, the disciplinary finding was that plaintiff ***failed to obey an order***, regardless of the content of that order.  Plaintiff cannot and does not dispute that he did not stop praying, and in fact, the records show that plaintiff and the other inmates continued to pray for ten minutes until the Sergeant arrived.

In fact, Captain Croyer did ***not find plaintiff guilty of any of the other rule violations***, stating that the inmates believed that they were allowed to pray in the mess hall as they were doing.  Plaintiff testified at the hearing that he and the other inmates had been praying in that manner before. (T. at 2).  The court would also point out that plaintiff did not initially make a statement in his defense at the disciplinary hearing.  It was Captain Croyer[6] who ***three times*** brought up the fact that plaintiff and the other inmates "were under the impression that it was ok for you to pray in your group back there." *Id.* at 2-3.  Captain Croyer ultimately stated that it appeared to him that "it was some misunderstanding where you were under the impression that it was ok to pray in a group down there in the messhall [sic]." (T. at 3).  Captain Croyer found

---

[6] The court understands that Captain Croyer is not a defendant in this case, however, this analysis is relevant because plaintiff was not disciplined for "praying," and in fact, Captain Croyer dismissed all the rule violations that were actually related to "praying" because he believed plaintiff's statement that the inmates believed that it was proper to pray in that location.

plaintiff "not guilty" of the "unauthorized assembly" and the "religious services" violation.

In his response to defendants' motion, plaintiff states that Officer McCoy could have waited until plaintiff was finished praying. (Dkt. No. 42-2 at p.1).  Plaintiff also states that he could not stop praying, and that he should have been allowed to continue because there was no "security issue" involved. *Id.*  In another of plaintiff's response documents, plaintiff states that he missed the Ramadan feast because he was in SHU, and that the Superintendent let plaintiff out of SHU because there was no rule stating that plaintiff could not pray in the mess hall. (Dkt. No. 42-5 at p.5).  Plaintiff states that he was given his job back and "was allowed to return to his cube at all of the rest of his prayer's time of prayer." *Id.*

Rather than arguing that plaintiff's First Amendment rights have not been violated, defendants argue in their motion that they are entitled to assert qualified immunity.  The doctrine of qualified immunity shields officials from liability from civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In *Pearson*, the Supreme Court overruled its decision in *Saucier v. Katz*, 533 U.S.194 (2001), to the extent that the Court in *Saucier* required a specific two-step sequence for deciding qualified immunity claims. *Pearson*, 129 S. Ct. at 815-22.

Under *Saucier*, when confronted with defendants' claim of qualified immunity, the court was mandated to use a two-step procedure. 533 U.S. at 201.  The first step required the court to determine whether plaintiff's facts established the violation of a constitutional right. *Id.*  If so, the court would then decide whether the right at issue was "clearly established" at the time of the defendants' alleged conduct. *Id.*  Decisions prior to *Saucier* had "suggested" that the better approach was to determine whether a constitutional right was violated at all, but *Saucier* turned

that suggestion into a requirement. *Pearson*, 129 S. Ct. at 816 (citing *Saucier*, 533 U.S. at 201:

*County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)(stating that resolution of the

constitutional issue first was the "better approach").

  In *Pearson*, the Supreme Court rejected what it referred to as *Saucier's* "'rigid order of

battle,'" in favor of allowing the courts to exercise their sound discretion in determining which of

the two prongs of the qualified immunity analysis should be addressed first. *See* 129 S. Ct. at 817-

818 (citing *Purtell v. Mason*, 527 F.3d 615, 622 (7th Cir. 2008)(referring to the *Saucier* standard

as a "rigid order of battle)). The court in *Pearson* stated that the unnecessary litigation of

constitutional issues is to be avoided, and there are cases in which it is "plain that a constitutional

right is not clearly established but far from obvious whether in fact there is such a right." 129 S.

St. at 818. This case is just such a case. Thus, the court will first address whether a right was

"clearly established."

  In *Shabazz v. Coughlin*, 852 F.2d 697, 700-702 (2d Cir. 1988), the Second Circuit held

that while an inmate's right to attend religious services in general was clearly established, the

right to group prayer and prayer in the yard was not well-established for purposes of qualified

immunity. In *Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999), the court held that Disciplinary Rule

105.11, prohibiting the conduct of "religious services" could not be used to discipline an

individual for silent demonstrative prayer in the prison yard. However, the court simply found

that the rule was unconstitutionally vague for due process purposes. *Id.* Because the district court

decided the case on the due process claim, the court did not reach the plaintiff's First Amendment

claim. *See Chatlin v. New York*, 96 Civ. 420, 1998 U.S. Dist. LEXIS 5671, *26-27 (S.D.N.Y.

April 23, 1998).

  The court in *Chatin* specifically stated, however, that it was ***not*** deciding the issue of

whether such conduct could be prevented by using a rule that gave inmates the required notice of what was prohibited. *Id.* at 89-90.  The court also stated that it was not suggesting that prison officials were prevented from preventing such conduct by utilizing already existing rules that prevented disturbances or interference with others when the circumstances warranted it. *Id.*  Thus, it still does not appear well established that an inmate has the right to pray at one's work assignment as plaintiff was attempting to do.[7]  This court is not aware of any case at or before the time of the incident that would "clearly establish" that plaintiff had a right to pray together with six other inmates in a work area during his working hours.[8]

In *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004), the plaintiff had been disciplined for failure to obey a corrections officer's order to return his tray and cup, an order plaintiff claims was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged." *Id*. at 204-05.  As a result of the disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability to break his Ramadan fast with the appropriate food. *Id.* at 199.  District Court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

> When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast.  In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not

---

[7] Plaintiff omits to mention that there were six other inmates praying with plaintiff at the time that defendant McCoy walked by them.

[8] The DOCS Directive regarding this issue allowed "individual demonstrative prayer" only in living quarters and designated religious areas whenever feasible as determined by the Superintendent. DOCS Directive 4202(K)(1).  Directive 4202(K)(2) provides that congregate or group prayer could only occur in a designated religious area, during a religious service or at other times as authorized by the Superintendent.  The Central Office Review Committee cited this Directive in its final denial of plaintiff's grievance.

12

> permit him to respond to the command before he had finished making
> *salat*.  If these allegations are true, an unconstitutional burden may have
> been placed on McEachin's free exercise rights.

*Id*. at 201 (footnote omitted).  The *McEachin* court thus emphasized the allegation that the

corrections officer intentionally ordered plaintiff to perform the task, knowing that obeying the

order would require plaintiff to violate his religious beliefs.  *Id.* at 204.  The court observed that

"[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks

that violate their religious beliefs." *Id.* at 205 (citing *Hayes v. Long*, 72 F.3d 70 (8th Cir.

1995)(inmate disciplined for refusing to handle pork while performing kitchen duties)).  The

court in *McEachin* ultimately did not rule on this issue because it remanded the case to the district

court for consideration of the First Amendment claims.  *McEachin* does not clearly establish the

right asserted by plaintiff in the case at bar.

In *Withrow v. Bartlett*, 15 F. Supp. 2d 292 (W.D.N.Y. 1998), the court granted summary

judgment in a case in which plaintiff was disciplined for engaging in group demonstrative prayer

in the prison yard and violating an officer's order to stop.  *Withrow* and the case at bar may be

distinguished from *McEachin* on the ground that in this case and *Withrow* the prohibited activity

resulting in the officer's order was the method of prayer, that is, a group prayer in an area of the

prison where it was not authorized by the existing rules.  The officers issuing the orders believed

that the plaintiffs' religious conduct was not permitted, a belief that was supported by the DOCS

Directive.

In this case, as stated above, plaintiff pled guilty[9] without question to the charge of failure

---

[9] The court also notes that plaintiff pled guilty to this charge at the beginning of the hearing without discussion. (T. at 2).  Plaintiff never gave the hearing officer an opportunity to find plaintiff "not guilty" of the charge.  Plaintiff had also requested the Imam as a witness, but plaintiff decided at the beginning of the hearing that he did not wish the Imam to testify. (T. at 1).  Given the later conduct of the hearing officer in emphasizing that the entire incident was a "misunderstanding," it is possible that plaintiff might not have been found guilty had he not pled guilty.  As stated above, the hearing officer brought the misunderstanding up himself.  It appeared that plaintiff was not planning on making any statements in his defense.

to obey an order.  Additionally, it is clear that other inmates were involved, and thus, plaintiff was not simply conducting an individual prayer.[10]  Apparently, defendant McCoy had no way of knowing what the inmates were doing, since it is clear that no one responded when he ordered the inmates to stop.  The DOCS Directive regarding prayer supported defendant McCoy's actions[11]; he could not reasonably have believed that his actions were in violation of plaintiff's constitutional rights.  Plaintiff acknowledges that after he was released from confinement, he was given his job back and allowed to go back to his "cube" at all the appropriate times to pray.  Thus, based on the facts in this case, any claim for damages would be barred by the doctrine of qualified immunity even if ultimately plaintiff's First Amendment rights had been infringed.

Qualified immunity would not, however, bar any claim for equitable relief. *See Pearson*, 129 S. Ct. at 822 (no qualified immunity in cases in which injunctive relief is sought instead of or in addition to damages); *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006)(qualified immunity is an affirmative defense to monetary liability).  Plaintiff requests only equitable relief from the Superintendent for his conduct.  Plaintiff alleges that defendant Taylor allowed the officer to put plaintiff in SHU when there was no "rule" against praying in the mess hall.  Plaintiff requests that defendant Taylor "implement policies and procedures" allowing Muslims to pray at "set" times even if they work in the mess hall. AC at p.5(a).

However, plaintiff is no longer incarcerated at Gouverneur.  An inmate's transfer from a facility generally renders moot any claims for declaratory and injunctive relief against officials of

---

[10] In one of the documents in response to defendants' motion, plaintiff disputes that he was praying in a "group," although he does not dispute that there were six other inmates with plaintiff. (Dkt. No. 42-1 at p.4).  It is unclear how defendant McCoy could have known what plaintiff and the other inmates were thinking and whether they meant to be in a "group" or not.

[11] The issue of plaintiff missing the Ramadan feast because he was in SHU is not a part of this action, and McCoy was not responsible for things that may have happened to plaintiff after McCoy's conduct.

14

that facility. *Salahuddin*, 467 F.2d at 272 (citing *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996)(*per curiam*); *Young v. Coughlin*, 886 F.2d 567, 568 n.1 (2d Cir. 1989); *Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976)).  Because this plaintiff is no longer incarcerated at Gouverneur, his claims for declaratory and injunctive relief must be dismissed as moot.

  The court notes that in one of the five documents that plaintiff filed in opposition to defendants' motion, he appears to be raising a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* (Dkt. No. 42-5 at p.4). RLUIPA prohibits the government from imposing substantial burdens on religion, even when the burden results from a neutral law of general applicability. *Pugh v. Goord*, 571 F. Supp. 2d 477, 503 (S.D.N.Y. 2008)(citation omitted).  If the government substantially burdens an inmate's religious exercise, the government must demonstrate that the imposition of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.* (quoting 42 U.S.C. § 2000cc-1(a)).  The burden on defendants in a RLUIPA case is higher than the burden articulated by the Supreme Court in *Turner v. Safely*, 482 U.S. 78 (1987) for claims under the constitution.  The constitutional analysis under *Turner* requires only that the burden on the inmate's religious rights be "reasonably related to legitimate penological interests." *Id.* at 89.

  Plaintiff in this case never raised this issue until his response to defendants' motion for summary judgment.  The court must treat *pro se* submissions with particular liberality and would be required to construe his pleading to include a claim under RLUIPA even though the complaint did not request such relief. *McEachin v. McGuinnis* 357 F.3d 197, 200 (2d Cir. 2004).  However, in this case, plaintiff's attempt to raise a RLUIPA claim would not be able to succeed.  The qualified immunity would apply to plaintiff's RLUIPA claim. *See Orafan v. Goord*, 411 F. Supp.

2d 153, 158 (N.D.N.Y. 2006), *vacated and remanded on other grounds sub nom. Orafan v. Rashid*, 249 Fed. Appx. 217 (2d Cir. 2007).  In any event, it has been held that a RLUIPA plaintiff may not obtain monetary damages under the statute either from defendants in their individual or official capacities. *Pugh*, 571 F. Supp. 2d at 506-509.[12]  Thus, plaintiff in this case would not be able to obtain money damages from defendants.

As stated above, plaintiff has been transferred out of Gouverneur, and can no longer obtain declaratory or injunctive relief from defendants at that facility.  Thus, to the extent that plaintiff's response to defendants' motion purports to raise a new claim under RLUIPA against the existing defendants, it must also be dismissed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that defendants' motion for summary judgment (Dkt. No. 37) is **GRANTED** and the amended complaint is **DISMISSED IN ITS ENTIRETY.**

Date:  March 27, 2009

Norman A. Mordue
Chief United States District Court Judge

---

[12] The Fifth Circuit has recently held that RLUIPA affords inmates the ability to obtain declaratory and injunctive relief against a "government," but does not provide for damages against either a defendant in his individual capacity or the state, including defendants in their "official capacities." *Sossamon v. Lone Star State of Texas*, 2009 U.S. App. LEXIS 3701, *19-34 (5th Cir. Feb. 17, 2009)(discussing cases, including those circuits that have allowed such actions, however, noting that where such a claim is allowed individually, the qualified immunity analysis would apply).